In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 19-1985

MICHAEL EDWARD REINAAS,

*Plaintiff-Appellant,*

*v.*

ANDREW M. SAUL, Commissioner of Social Security,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 16-cv-814 — **William M. Conley**, *Judge.*

_____

ARGUED MARCH 3, 2020 — DECIDED MARCH 16, 2020

_____

Before EASTERBROOK, KANNE, and ST. EVE, *Circuit Judges.*

PER CURIAM. Michael Reinaas seeks Social Security disability benefits, asserting that he became disabled from neck and shoulder pain in January 2013 after undergoing right shoulder surgery. Relying on reports by two non-examining state-retained doctors over a treating physician's opinion, the

administrative law judge found that Reinaas's subjective descriptions of his pain and functional limitations were not credible and determined that he was not disabled because he could still perform light work with some restrictions. The district court upheld that determination. But substantial evidence does not support the ALJ's decision to discount the treating physician's opinion, and the ALJ did not adequately evaluate his subjective complaints. We therefore vacate the judgment and remand for further proceedings.

## I. BACKGROUND

Reinaas, now in his mid-fifties, lives on a small farm in rural Wisconsin and has a history of neck fusion surgeries and cervicogenic headaches (pain perceived in the head that comes from a source in the neck). Until 2010, he worked as a machine operator in a factory, which entailed heavy lifting. But he injured his spine and tore his right rotator cuff on the job, and he stopped working while he underwent two neck fusion surgeries—one in 2010 and the other in 2011—for his spinal injury. He was granted benefits for a closed period of disability that ended in July 2012.

Reinaas planned to return to work after the second neck fusion surgery, but he continued to suffer from severe headaches originating in his neck (which he treated with hydrocodone), shoulder pain, and a decreased range of motion in his neck and shoulder. In July 2012, a neurologist diagnosed him with cervicogenic headaches, and his family doctor made further diagnoses of "long term nuchal headaches" (headaches originating from the nape of his neck) and "[p]ermanent pain syndrome post cervical fusion."

Dr. Donald Bodeau, an occupational physician from the local branch of the Mayo Clinic assisting Reinaas with a worker's compensation application, opined that Reinaas could not return to his job at the factory and recommended that he be retrained for lighter work. After determining that Reinaas was at risk for "accelerated degenerative changes at disk levels adjacent to the fused segments" in his neck, he suggested surgical intervention to address Reinaas's headaches and shoulder pain from the torn rotator cuff.

On January 11, 2013, Reinaas had right shoulder surgery. His surgeon, Dr. Andrew Israel, explained that recovery could take up to a year and that he could not predict whether the surgery would completely restore functionality to Reinaas's arm. While recurrence of pain was a risk, he said pain relief was a possible outcome.

After the surgery, Reinaas attended twice-weekly physical therapy from February to June and took naproxen and Vicodin for his pain. Dr. Mark Vrieze, his physical therapist, documented steady gains in his strength and range of motion, and Reinaas gradually returned to some of his pre-surgery activities: In March, he shoveled snow from his driveway; in April, he moved two cords of firewood; in May, he briefly used a chainsaw; and in June, he used a garden tiller. But he suffered from fluctuating levels of pain and soreness in his neck and shoulder that worsened when he was active, and he needed Vicodin to sleep.

Four months after his surgery, Reinaas reported to Dr. Israel that he was "better than he was preoperatively" but had ongoing soreness in his neck and shoulder. Dr. Israel "hope[d]" Reinaas's symptoms would improve but told him he could not do anything more for him surgically. Reinaas

then applied for disability benefits, asserting that he became disabled again in January 2013 after his surgery. When his physical therapy ended a few weeks later, Dr. Vrieze reported that he had made significant progress with daily living activities. Though Reinaas required rest periods and performed inconsistently because of his fluctuating symptoms, he could tolerate "fairly heavy work" at his own pace. But his shoulder and neck pain persisted and flared when he was active, and he needed anti-inflammatories and pain medication.

A few days after Reinaas's physical therapy ended in June 2013, Dr. Bodeau opined that Reinaas was at "10% disability at the shoulder" and suggested that he was permanently disabled from "a number of related injuries." He concluded that Reinaas suffered from "moderate residual pain, weakness, loss of motion and loss of endurance" from the surgery after an examination. Based on these symptoms, he prescribed Reinaas permanent work restrictions, limiting working to no more than "four hours per day five days per week" and not lifting more than 25 pounds. Reinaas had additional work restrictions, he said, from complications with his other surgeries.

Months later, the agency denied Reinaas's application for disability benefits when Dr. Jose Ruiz, a state-retained physician, reviewed his medical records and concluded that his accounts of his symptoms were not fully credible. His application was denied again at reconsideration, after Dr. Anne Prosperi, another non-examining state-retained physician, reviewed Reinaas's medical records and opined that his residual functional capacity enabled him to sit or stand with normal breaks for most of a normal workday. Reinaas requested a hearing.

In April 2014, several months before the hearing, Reinaas followed up with Dr. Bodeau, and Dr. Bodeau opined that Reinaas had "deteriorated significantly," suffered from cervicogenic headaches and residual problems with his surgeries, and was "highly unlikely to successfully regain employment at any physical demand level."

Reinaas had severe headaches at least twice weekly, and an examination revealed "significant posterior muscle spasm[s] along the cervical paraspinals and bilateral trapezius areas," "objective signs of persistent nerve damage," and loss of cervical motion.

Based on these observations, Dr. Bodeau filled out a Treating Source Inquiry form, indicating that Reinaas had spinal disorders and nerve root compression that were presumptively disabling, and that he suffered from two or more severe migraines per month despite prescribed treatment. Reinaas would not be a reliable worker, Dr. Bodeau wrote, and neck and shoulder pain would cause him to be absent approximately 4 days per month.

On a workers' compensation form, Dr. Bodeau checked boxes stating that Reinaas could no longer work and that his condition had worsened.

At the hearing before the ALJ, Reinaas testified that his migraines, neck and shoulder pain, and difficulties with daily living since his shoulder surgery made him unable to work. He described his head movements as limited "generally just nipple-to-nipple" and explained that he took pain medication almost daily. He suffered from severe migraines, each lasting between half an hour to three days, 10 to 15 days a month.

Because his wife worked off the farm and "stuff has to get done," Reinaas tried to work through his pain when he needed to shop, mow the lawn, chop wood with a light chainsaw, take care of his son (a first-grader), and feed the farm animals. But these activities caused pain and fatigue, and he needed frequent breaks. He did not drive or use heavy machinery when he took pain medication.

Then a vocational expert testified, opining that Reinaas had some employment prospects if he was restricted to doing light work and could be off task for up to 10 percent of the workday. He would be unemployable, however, if he required unscheduled breaks longer than one to two minutes. And an employer would tolerate only eight or nine unscheduled absences during a year.

Following the five-step evaluation process, *see* 20 C.F.R. § 404.1520, the ALJ concluded that Reinaas was not disabled. She found that Reinaas suffered from obesity; degenerative disc disease; spine disorders; major joint dysfunction; and arthropathies, which were "severe"; and longstanding migraines, which were not disabling because Reinaas infrequently sought treatment for them after his alleged disability onset.

The ALJ then concluded that none of Reinaas's impairments, alone or in combination, met the severity of a listed impairment presumptively establishing disability. Based on his residual functional capacity ("RFC"), the ALJ found that Reinaas could not return to his work but, consistent with the vocational expert's testimony about a claimant with his qualifications and RFC, could perform a number of jobs at the

"light"[1] level with additional restrictions, including being off task up to 10 percent of the day.

In determining Reinaas's residual functional capacity, the ALJ afforded great weight to the opinions of Dr. Ruiz and Dr. Prosperi, the two non-examining agency physicians. She agreed with them that Reinaas's subjective complaints were not credible because they were "inconsistent" with the medical evidence.

She gave little weight to Dr. Bodeau's April 2014 opinion that Reinaas was disabled, explaining that there was "no evidence that Dr. Bodeau had any knowledge of Social Security disability rules and regulations," that Reinaas had only returned to him at his disability lawyer's request, and that the report was based only on subjective complaints of questionable credibility.

After the district court affirmed the denial of benefits, Reinaas appealed.

## II. ANALYSIS

This court reviews an ALJ's decision to see if it is supported by substantial evidence—evidence a reasonable mind might accept as adequate to support a conclusion. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

*A. Weight of Treating Physician's Opinion*

Reinaas first argues that the ALJ did not provide a good reason for refusing to give controlling weight to Dr. Bodeau's

---

[1] "Light" work requires either "a good deal of walking or standing" or sitting "with some pushing and pulling of arm or leg controls," as well as frequent lifting and carrying of objects weighing up to 10 pounds and no lifting of more than 20 pounds at a time. *See* 20 C.F.R. § 404.1567.

April 2014 opinion. Because Reinaas advanced this claim before 2017, a treating source's opinion is entitled to controlling weight if it is supported by sound medical evidence and a consistent record. *See* 20 C.F.R. § 404.1527(c)(2); *Hall v. Berryhill*, 906 F.3d 640, 643 (7th Cir. 2018).

Here, the ALJ concluded that Dr. Bodeau's opinion did not deserve controlling weight because it was based only on Reinaas's subjective report of symptoms and because it was "inconsistent" with the record. But, because the ALJ failed to adequately support these conclusions, her decision to discount Dr. Bodeau's opinion is not supported by substantial evidence. *See Meuser v. Colvin,* 838 F.3d 905, 910 (7th Cir. 2016).

First, the ALJ ignored the relevant regulatory considerations in assessing the weight to give Dr. Bodeau's opinion about Reinaas's limitations. In declining to afford the opinion controlling weight, the ALJ was required to, but did not, explain her decision with reference to the nature and extent of his treatment and his area of specialty. *See* 20 C.F.R. § 404.1527(c); *Hall*, 906 F.3d at 644.

She was also required to specify what weight Dr. Bodeau's opinion *did* deserve. 20 C.F.R. § 404.1527(c). Her answer appears to have been "none," but she did not set forth, much less explain, that determination. In light of Dr. Bodeau's specialty and treatment relationship with Reinaas, the evidence to support the ALJ's determination is less than substantial.

Dr. Bodeau is an occupational health specialist who, as of April 2014, had been treating Reinaas for at least four years. He reasonably knew Reinaas's medical history and previous complaints and, thus, could evaluate Reinaas's newly reported symptoms. The ALJ instead relied on the opinions of

two non-examining state-retained physicians who did not have firsthand knowledge of how his symptoms could have worsened over time. *See Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir. 2003).

Second, the ALJ erred in determining that the April 2014 opinion was based solely on Reinaas's subjective complaints. True, Dr. Bodeau's treatment notes catalog some subjective complaints about pain and headaches. But those treatment notes also show that Dr. Bodeau examined Reinaas and observed visible muscle spasms, objective signs of persistent nerve damage, and limited range of motion in his neck *before* he concluded that Reinaas had "deteriorated significantly" and was permanently disabled.

Third, the ALJ pointed to several instances in Reinaas's medical records where doctors reported that he was doing "well" in recovery – but said nothing about the accompanying notes that he was still in pain and suffered from residual post-surgery complications.

Reinaas cannot prevail by arguing that the ALJ improperly weighed the evidence, but he correctly notes that the ALJ overlooked entire swaths of it. An ALJ "cannot simply cherry-pick facts supporting a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir. 2010).

The record shows that, despite Reinaas's progress in physical therapy, he continued to report pain to Dr. Bodeau, as well as Dr. Vrieze (his physical therapist) and Dr. Israel (his surgeon). And, as counsel points out, the worsening symptoms noted in Dr. Bodeau's 2014 report are consistent with Reinaas's diagnosis of chronic shoulder impingement, his

history of fusion surgeries, and Dr. Bodeau's pre-surgery caution that the cervical discs in his neck were at risk of degenerating.

Finally, the ALJ discounted Dr. Bodeau's 2014 opinion because Reinaas visited the doctor that year only in connection with his disability application. But the mere fact that a medical opinion has been solicited to support a disability application is not a sufficient reason to ignore it. *See Punzio v. Astrue,* 630 F.3d 704, 712 (7th Cir. 2011). Dr. Bodeau already had a treating relationship with him and knew his history. Thus, the ALJ's reasoning on this point does not logically support her conclusion.

*B. Reinaas's Subjective Complaints*

Reinaas also argues that the ALJ erred by discrediting his subjective complaints of pain and its limiting effects on his physical capabilities. He insists that his RFC should have been more restrictive because complaints of pain were credible in light of his multiple impairments, and that the ALJ improperly assessed his abilities with respect to daily activities. As a result, he says, her conclusion that he could still perform light work in spite of his impairments is not supported by substantial evidence.

We agree with Reinaas that the ALJ did not properly assesses the intensity and limiting effects of Reinaas's subjective symptoms. *See* 20 C.F.R. § 404.1529; SSR 16-3P, 2017 WL 5180304 (Oct. 25, 2017). First, the ALJ ignored the connection between his migraines and his substantial history of spinal problems and surgeries—which could reasonably be expected to produce disabling migraine-like headaches. *See id.* at § 404.1529; *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir.

2009). The ALJ only briefly acknowledged Reinaas's spinal injury and his neck fusion surgery, and she scarcely addressed the previous diagnoses of cervicogenic headaches. And she did not credit Dr. Bodeau's April 2014 opinion, which corroborates the testimony at hearing.

Second, the ALJ cited Reinaas's ability to use a chainsaw, mow the lawn, and care for his child but ignored his testimony about the pain and fatigue these activities cause him and his limitations with them. ALJs need not address every piece of evidence in the record, *see Villano,* 556 F.3d at 562, but an ALJ may not ignore an entire line of evidence contrary to her ruling. *Meuser,* 838 F.3d at 912. Here, the ALJ discussed Reinaas's ability to perform some heavy activities on his few "good" days every month but failed to address his contentions that he could only do twenty minutes of activity at a time before he needed rest and that he had 10 to 15 bad days in a month. Again, the problem is not that the ALJ weighed the evidence in a certain way; it is that she cited only evidence favorable to her decision without discussing any contrary evidence.

Finally, because Reinaas lived on a farm in rural Wisconsin and his wife worked away from the farm, many of his activities were routine acts of daily living on a small farm. He testified that "stuff has to get done" and that he frequently "work[ed] through the pain." We have previously cautioned ALJs that there are critical differences between keeping up with activities of daily living and holding down a full-time job. *See Beardsley v. Colvin,* 758 F.3d 834, 838 (7th Cir. 2014); *Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir. 2012). And here, Reinaas's ability to do limited work to maintain his small farm

does not adequately support the ALJ's conclusion that he would be able to work full time.

For the foregoing reasons, we VACATE the judgment and REMAND to the district court with instructions to remand to the agency for further proceedings.